*E-FILED: September 20, 2012*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CALIFORNIA NURSES ASSOCIATION,<br><br>    Plaintiff,<br>  v.<br><br>GOOD SAMARITAN HOSPITAL, L.P. d/b/a<br>GOOD SAMARITAN HOSPITAL,<br><br>    Defendant.<br>_____/ | No. C11-02142 HRL<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: Docket Nos. 24, 25] |

The sole issue in this declaratory relief action is whether Good Samaritan Hospital, L.P. legally may be reimbursed by the California Nurses Association for wages and benefits paid to one of the hospital's registered nurses, who is also an elected official of the California Nurses Association, for time she spends on union-related matters. Specifically, the parties disagree whether such a reimbursement arrangement violates section 302 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 186.

Now before the court are the parties' cross-motions for summary judgment. Each party has expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); FED. R. CIV. P. 73. Upon consideration of the moving and responding papers, as well as the arguments of counsel, this court grants plaintiff's summary judgment motion and denies defendant's summary judgment motion.

BACKGROUND

The facts are undisputed. The following background is drawn from the parties' Joint Statement of Stipulated Facts:

Plaintiff, the California Nurses Association (CNA), is a professional association and labor organization, which has been certified by the National Labor Relations Board as the exclusive collective bargaining representative of a unit of approximately 900 non-supervisory registered nurses employed by defendant Good Samaritan Hospital in San Jose, California. CNA represents approximately 65,000 registered nurses in California and many more outside California through its national organizing program, the National Nurses Organizing Committee (NNOC). CNA is affiliated with National Nurses United (NNU), a national labor organization and professional association representing approximately 160,000 registered nurses throughout the United States.

Defendant Good Samaritan Hospital, L.P., d/b/a/ Good Samaritan Hospital (Good Samaritan) is a limited liability partnership organized under the laws of Delaware with its principal place of business in San Jose, California.

Pension and retirement benefits for employees of Good Samaritan are governed by the terms of the San Jose Market Pension Plan, as amended and restated generally effective January 1, 2009 (Pension Plan). (See Complaint, Ex. 1).

For all relevant time periods including the present, CNA and Good Samaritan have been parties to a collective bargaining agreement (CBA) governing the terms and conditions of employment of registered nurses working in the CNA-represented bargaining unit at Good Samaritan. That CBA also governs the terms and conditions of approximately 700 registered nurses working in the CNA-represented bargaining unit at the Medical Center of San Jose, a hospital affiliated with Good Samaritan. (See Complaint, Ex. 2).

In accordance with the Pension Plan and with Article 9.7 of the CBA, Good Samaritan contributes to its nurses' pension and retirement benefits pursuant to a formula that is based on total compensation earned as determined by the number of hours worked for the hospital. (See

Complaint, Ex. 1 (First Amendment to The San Jose Market Pension Plan, Article V.1 at p. 21); Ex. 2 (CBA at p.16)).

The Pension Plan was amended effective January 1, 2010 to, among other things, expand the definition of "hours of service" in Section 2.40 of the Plan to add the following:

> For Participants who are registered nurses elected to statewide and/or national office with the California Nurses' Association, to the extent not otherwise credited under subsections (a) through (f) above, each hour for which the Participant is paid or entitled to payment from the Affiliates for time missed from the Participant's regular work schedule with the Affiliates due to business of the California Nurses' Association.

(Complaint, Ex. 1 (First Amendment to the San Jose Market Pension Plan)).

At around the same time, CNA and Good Samaritan and its related facility, the Regional Medical Center of San Jose (collectively, "the hospitals"), entered into a Letter of Understanding (LOU) supplementing the CBA between CNA and the hospitals titled "Association Leave and Benefit Accrual for State-Wide or National CNA Officers." The LOU, which also was effective January 1, 2010, presumably was created to avoid running afoul of LMRA section 302. Pursuant to that LOU, the hospitals agreed to pay wages and contribute to the pension and retirement benefits plans for registered nurses employed at the hospitals who are elected to CNA statewide or national offices for the time lost from their regular nursing schedule due to work on union matters in their positions as union officers—provided that CNA reimburses the hospitals for those wages and benefits, including administrative fees. (See Complaint, Ex. 3).

One of the registered nurses employed at Good Samaritan, Malinda Markowitz, is a senior officer of CNA. She was duly elected by the members of the organization as CNA's Secretary for two successive terms running from September 2003 to September 2007, and then as one of its Co-Presidents beginning in September 2007 and continuing through the present. She also was elected to a national office, serving as a Vice President of CNA's parent organization, NNU, since December 2009 and continuing through the present.

3

Markowitz has been an employee of Good Samaritan since 1978. She obtained her Registered Nursing license from the State of California in 1980 and has worked as a registered nurse at Good Samaritan ever since.

Throughout her service as an officer of CNA and NNU, Markowitz has remained employed as a registered nurse at Good Samaritan. She currently is identified as a ".7 day status" employee at Good Samaritan, meaning that she would normally work 56 hours (or seven eight-hour shifts) during each two-week pay period. When working as a direct care, bedside registered nurse, she receives an hourly wage from Good Samaritan and is expected to clock-in and clock-out in accordance with the hospital's time-keeping procedures. When Markowitz is away from the hospital working on union matters, she is not clocked-in on the hospital's time-keeping system.

Markowitz's duties as a CNA/NNU officer require her to spend a significant portion of her time working on union-related business. While some of her union duties take place at Good Samaritan in San Jose, most of these activities take place at other locations. Markowitz's CNA-related duties include (1) serving on the union bargaining team during contract negotiations at Good Samaritan; (2) serving as a resource for contract interpretation and enforcement at Good Samaritan; (3) meeting with registered nurses employed at other hospitals (some of which may be affiliated with the parent holding company of Good Samaritan for purposes of planning and assisting with organizing campaigns and collective bargaining negotiations at those facilities); (4) advocating for improvements in patient care and the professional practice of registered nursing; (5) attending regular meetings of the CNA and NNU Board of Directors; (6) serving on various committees of those organizations; and (7) serving as an official spokesperson for CNA and NNU at functions and events.

Good Samaritan is a separate and distinct employer from any other hospital that is affiliated with Good Samaritan's parent holding company. Good Samaritan does not employ any person from those other hospitals, and Markowitz is not an employee of those other hospitals.

1    Good Samaritan pays Markowitz's wages only for time spent working as a bedside care
2 giver in the hospital. CNA and/or NNU pay her wages for time spent working on union and
3 professional practice matters outside the hospital.

4    Hospital time sheet and payroll records indicate that from January 2008 through
5 September 2011, Markowitz spent approximately 60% of her required .7 status time performing
6 nursing duties at Good Samaritan, while the remainder of the time (approximately 40%) was
7 spent on CNA/NNU matters. This 60% estimate includes sick time, holiday pay, paid time off,
8 and EIB pay, all of which count towards Markowitz's .7 status as a Good Samaritan employee.

9    When Markowitz misses a scheduled work shift at Good Samaritan due to union
10 business, she fills out a Lost Time and Payment Voucher and the responsible union
11 compensates her accordingly.

12    Historically, Markowitz's pension benefits were based solely on hours worked while
13 clocked in at Good Samaritan. Under the Pension Plan, an employee receives "participation"
14 credit for every year in which they work at least 1,000 hours. Because Markowitz's duties with
15 CNA and NNU have required her to spend approximately 40% of her working time away from
16 the hospital on union business, the net result was that in 2008, 2009 and 2010, Markowitz lost
17 years of "participating service" towards her pension by virtue of the fact that her actual hours
18 worked for Good Samaritan fell below the 1,000-hour threshold.

19    Good Samaritan has yet to comply with the LOU. To date, defendant has paid
20 Markowitz wages only for time spent actually working as a bedside nurse at Good Samaritan
21 and awarded her pension credit only for actual hours worked at the hospital.

22    CNA believes that the LOU provides a method by which Good Samaritan legally may
23 pay wages and provide pension credit to Markowitz for time she spends on union-related
24 matters outside of her direct patient care job duties. CNA requested that Good Samaritan honor
25 the LOU by paying Markowitz and making pension contributions on time lost from her regular
26 work schedule due to CNA/NNU-related business and accepting reimbursement from CNA.
27 Good Samaritan refused, claiming that the agreed-upon arrangement would violate the
28

5

1  restrictions on financial transactions between employers and labor unions set forth in section
2  302(a) of the LMRA, 29 U.S.C. § 186(a).

3  CNA then filed the instant lawsuit, seeking a declaration of "the legality of the
4  arrangement reflected in the [LOU] and the propriety of incorporating such agreement into the
5  Pension Plan." (Complaint at 5). Each side now moves for summary judgment on the sole
6  issue whether the payments and benefits at issue violate the LMRA.

## LEGAL STANDARD

8  A motion for summary judgment should be granted if there is no genuine issue of
9  material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P.
10 56(a), (c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party
11 bears the initial burden of informing the court of the basis for the motion, and identifying
12 portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits
13 which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477
14 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce
15 evidence negating an essential element of the nonmoving party's claim or defense or show that
16 the nonmoving party does not have enough evidence of an essential element to carry its ultimate
17 burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,
18 210 F.3d 1099, 1102 (9th Cir. 2000).

19 If the moving party meets its initial burden, the burden shifts to the non-moving party to
20 produce evidence supporting its claims or defenses. See Nissan Fire & Marine Ins. Co., Ltd.,
21 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the
22 adverse party's evidence, but instead must produce admissible evidence that shows there is a
23 genuine issue of material fact for trial. See id. A genuine issue of fact is one that could
24 reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the
25 outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

26 "When the nonmoving party has the burden of proof at trial, the moving party need only
27 point out 'that there is an absence of evidence to support the nonmoving party's case.'"
28 Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at

United States District Court
For the Northern District of California

325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

## DISCUSSION

Section 302 of the LMRA regulates payments by employers to employee representatives. It provides, in relevant part, that "[i]t shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value . . . to any representative of any of his employees who are employed in an industry affecting commerce." 29 U.S.C. § 186(a). Relatedly, LMRA section 302(b) makes it illegal "for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section." Id., § 186(b)(1).

There are several exceptions to these restrictions. For instance, LMRA section 302(c)(1) provides that the statutory restrictions shall not apply:

> in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer.

29 U.S.C. § 186(c)(1).

Good Samaritan contends that the LOU's reimbursement arrangement violates section 302 of the LMRA and that section 302(c)(1)'s exception does not apply. CNA argues that there is no need to invoke the safeguards of section 302, in the first instance, because (1) none of the ills the statute was meant to address are implicated here and (2) it is the union, not Good Samaritan, that ultimately compensates Markowitz for time she spends on union business. For the reasons discussed below, this court agrees with CNA.

LMRA section 302 is an anti-corruption provision intended to prevent acts considered harmful to the collective bargaining process, such as bribery of employee representatives by employers, extortion by employee representatives, and possible abuse of power by union

7

1 officials if welfare funds are left to their sole control. See 29 U.S.C. § 141; Arroyo v. United
2 States, 359 U.S. 419, 425-26, 79 S. Ct. 864, 3 L.Ed.2d 915 (1959). None of these factors are
3 implicated here. Good Samaritan expressly disclaims any intent to bribe Markowitz or any
4 union official. No one attributes any mischievous intent to Markowitz or CNA. And, there is
5 no suggestion that the parties' LOU agreement implicates a kickback or extortion scheme or
6 some other similarly corrupt practice. Rather, all indications are that the LOU is designed to
7 avoid the forfeiture of Markowitz's compensation and pension credits due to the time she is
8 obliged to spend on her union duties. No one contends that LMRA section 302 was meant to
9 impede or discourage an employee from serving as a union officer by requiring them to forfeit
10 their wages and benefits in the process. As stated by one court, "the purpose behind the statute
11 was to prevent bribe-taking and 'rackets' while preserving legitimate benefits to employees."
12 Communications Workers of America, AFL-CIO v. Bell Atlantic Network Services, Inc., 670 F.
13 Supp. 416, 420 (D.C. Cir. 1987).

14 The specific focus of Good Samaritan's concern, as this court understands it, is that the
15 LOU reimbursement arrangement could lead the parties down the proverbial "slippery slope."
16 However, when pressed by the court at oral argument, defendant could not adequately explain
17 where the alleged slope would lead. Good Samaritan hypothesized that, in labor-management
18 negotiations, an employee/union official being paid wages and benefits by her employer might
19 naturally be predisposed to side with management for that reason. Defendant nevertheless
20 indicated that it had no reason to believe that would happen. And, Good Samaritan later
21 acknowledged that, *absent reimbursement*, the situation presented in its hypothetical could
22 prove to be a slippery slope.

23 But, there is a reimbursement provision here, and it is the key factor distinguishing this
24 case from those cited by the parties—all of which involved situations where the employer paid
25 the wages and benefits of its employee/union representative for time spent on union-related
26 matters, without any reimbursement from the union.

27 The only binding authority that the parties have cited (and that this court has found) is
28 Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace

8

Aerostructures Group, 387 F.3d 1046 (9th Cir. 2004).  At issue in that case was the legality of a collective bargaining agreement requiring the employer (BF Goodrich) to pay the wages and benefits of a maintenance mechanic elected as the union's full-time "Chief Shop Steward."  The steward retained his employee status and remained on BF Goodrich's payroll, but devoted all of his time to union-related matters.  BF Goodrich took the position that it did not need to pay the steward his wages and benefits because he was not providing services to the company.  The key disputed issue was whether the steward was performing services as an "employee" of BF Goodrich.  The Ninth Circuit rejected the argument that the steward could be deemed an employee "simply by virtue of the fact that he remains on the company's payroll and continues to maintain a formal job classification."  Id. at 1057.  Instead, the court looked to the steward's actual services and various factors indicating that his day-to-day activities were controlled by BF Goodrich, and not the union.  The Ninth Circuit concluded that his union-related activities were a service that benefitted both the union and the company.  Thus, BF Goodrich's payment of his wages and benefits fell within section 302(c)(1)'s exception because that compensation was attributable to his services to the company, notwithstanding that he did not spend his time performing any mechanic work.  Id. at 1059-60.[1]

Good Samaritan argues that, under BF Goodrich, the hospital cannot lawfully pay Markowitz for the time she spends on union duties because her union-related work often takes place away from the hospital and concerns hospitals other than Good Samaritan.  The situation

---

[1] Other cases cited by the parties indicate that, while they used different approaches and analyses, other courts have also upheld employer-paid compensation to employees/union officials pursuant to union leave policies (i.e., pay and benefits for full-time union work) and "no docking" agreements (i.e., agreements permitting an employee representative to devote a portion of the work day or work week to union activities without loss of time or pay).  See, e.g., Caterpillar, Inc. v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America, 107 F.3d 1052 (3d Cir. 1997); Communications Workers of America AFL-CIO v. Bell Atlantic Network Services, Inc., 670 F. Supp. 416 (D.C. Cir. 1987); BASF Wyandotte Corp. v. Local 227, Int'l Chemical Workers Union, AFL-CIO, 791 F.2d 1046 (2d Cir. 1986); Nat'l Labor Relations Bd. v. BASF Wyandotte Corp., 798 F.2d 849 (5th Cir. 1986).  The only cited case in which the employer-paid compensation in question was found to violate the LMRA involved an industry steward who was under the control of the union, and therefore could not be characterized as an employee of the company.  See Reinforcing Iron Workers Local Union 426, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO v. Bechtel Power Corp., 634 F.2d 258 (6th Cir. 1981).

9

1 presented here, however, is markedly different from BF Goodrich. Unlike the shop steward,
2 Markowitz continues to work as a registered nurse for Good Samaritan. Indeed, the majority of
3 her time is devoted to her nursing and patient care duties at the hospital. True, much of her
4 union-related duties do not directly benefit Good Samaritan; and, in some instances, her union
5 work has nothing at all to do with that hospital. Yet, if there is anything that this court takes
6 from BF Goodrich, it is that one must look at the practical realities of the circumstances in a
7 given case. The reality here—and the key distinction from BF Goodrich—is that the union
8 bears the ultimate financial burden of compensating Markowitz for the time she spends
9 fulfilling her union duties. Because the union fully reimburses the hospital for her wages and
10 benefits (including all associated administrative costs), there is no net expense to Good
11 Samaritan arising from the time Markowitz spends on union business. Under these
12 circumstances, the hospital is not compensating Markowitz for her union work. Indeed, the
13 parties' agreement provides that if CNA fails to promptly (i.e., within 30 days) reimburse the
14 hospital, then defendant will have no obligation to honor the LOU until the union is current on
15 its payments to the hospital. (Complaint Ex. C). In other words, the LOU is designed to ensure
16 that Good Samaritan is not left paying Markowitz's wages and pension benefits for her union-
17 related work.

18 For these reasons, this court concludes that the reimbursement arrangement set out in the
19 LOU does not implicate section 302 of the LMRA and that there is no need to invoke the
20 protections of that statute here.[2]

21 ORDER

22 Based on the foregoing, plaintiff's summary judgment motion is granted and defendant's

---

26 [2] CNA points out that the U.S. Department of Labor (DOL) no longer requires
27 unions to report compensation received under union leave policies or "no docking" policies. Plaintiff argues that the DOL's rules and explanatory commentary indicate that the DOL
28 would not consider the reimbursement arrangement at issue here to be illegal. Inasmuch as those rules concern only the DOL's reporting requirements, the court does not find them relevant to the determination of the legality of the LOU agreement in question.

10

summary judgment motion is denied. The clerk shall enter judgment and close the file.

SO ORDERED.

Dated: September 20, 2012

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

1  5:11-cv-02142-HRL Notice has been electronically mailed to:

2  Christopher Stuart Olson     christopher.olson@lw.com

3  Jason Masashi Ohta     jason.ohta@lw.com, becky.neidhardt@lw.com, cathy.trout@lw.com, karin.sanders@lw.com

4  Katherine Ann Lauer     katherine.lauer@lw.com

5  Pamela Sue Allen     pallen@calnurses.org

7  Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.